**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 76503-5-I consolidated with |
| | ) | No. 77400-0-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| AARON REY YBARRA, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: August 19, 2019 |
| | ) | |

MANN, A.C.J. — Aaron Ybarra planned a school shooting and chose Seattle Pacific University (SPU) as his target. On June 5, 2014, Ybarra drove to the SPU campus to carry out his plan. Ybarra killed one student and injured several others. Ybarra appeals his conviction and sentence for one count of first degree murder, three counts of attempted first degree murder, one count of second degree assault—all with a firearm enhancement and the aggravator that the crime involved a destructive and foreseeable impact on persons other than the victims. Ybarra alleges that there were three improper judicial comments on the evidence, that the trial court erred in denying his request for second degree murder and second degree attempted murder instructions, and that his counsel was ineffective at sentencing. We affirm.

I.

A.

On June 5, 2014, Ybarra left his house with a double-barrel shotgun in a garbage bag and drove to SPU. Ybarra chose to carry out his plan at Otto Miller Hall ("OMH") because it was close to the street and parking was easy. Ybarra parked his truck behind OMH so he could enter a classroom through the back door, but it was locked. Instead, Ybarra parked his car across the street from OMH. Ybarra filled his pockets with 50 shotgun shells before crossing the street and making his way toward the front doors of OMH.

SPU students Anna Sophia Curturlio-Hackney and Thomas Fowler were standing outside the front doors of OMH when Ybarra aimed the gun at them and said "freeze" or "get inside." At the same time, Paul Lee walked between Ybarra and Cuturlio-Hackney, wearing headphones, unaware of the threat Ybarra posed. Ybarra yelled "freeze" at Lee and fatally shot him in the back of the neck.

Bird shot from the blast hit Fowler in the face, neck, and chest. Ybarra then aimed his shotgun at Curturlio-Hackney and pulled the trigger, but the shotgun did not fire. Curturlio-Hackney and Fowler both fled behind the building.

Ybarra entered OMH lobby and aimed his shotgun at Tristan Cooper-Roth, who was studying at a table in the lobby. Ybarra told Cooper-Roth not to "disrespect him because he shot someone outside." Ybarra then turned to Sarah Williams. Williams was walking down the stairs into the lobby when Ybarra shot her in the chest. Ybarra began reloading the shotgun as Cooper-Roth fled the building.

Jon Meis, who was in the building-monitor office, entered the OMH lobby and heard Ybarra say "don't move" while pointing his shotgun at a student. Meis was out of Ybarra's line of sight and hit the panic button to alert campus security. Meis heard the gunshot that hit Williams and saw Ybarra trying to reload the shotgun. Meis grabbed a canister of pepper spray and sprayed Ybarra in the face. Meis then tackled Ybarra and wrestled the shotgun away. Ybarra attempted to pull a hunting knife from his pocket, but Meis pinned Ybarra's arm and kicked it away. Justin Serra and Meis held Ybarra until campus security and Seattle Police arrived. Ybarra told them they should have let him keep his knife because he was going to use it to kill himself.

The State charged Ybarra with first degree murder of Lee, three counts of attempted first degree murder of Fowler, Curturlio-Hackney, and Williams, and second degree assault of Cooper-Roth. Each count had a firearm enhancement and alleged that the crime involved a destructive and foreseeable impact on persons other than the victims under RCW 9.94A.535(3)(r). Ybarra argued that he was not guilty by reason of insanity, was acting on God's plan, and was influenced by Satan and Lucifer.

## B.

At trial, the jury heard testimony about Ybarra's premeditation of the crimes from three primary sources: Ybarra's journal, a police interview, and Ybarra's testimony at trial. In both Ybarra's journal and during the police interview, he explained that he planned to kill students at SPU because of his hatred toward the world and was inspired by the Columbine and Virginia Tech shootings. At trial, however, Ybarra's story changed, instead he was carrying out "God's Plan."

-3-

Ybarra's Journal Entries

Ybarra explained his intent in his journal. On June 2, 2014, Ybarra explained how and why he chose to target SPU:

> I use to always hate violence towards women, but there is no doubt that I'm going to kill quite a few in the shootout, I don't care anymore. There are a few universities in the state to pick from that I'm planning to attack. Washington State is the main target. I can't make it there with out [sic] any suspision, [sic] my parents will keep wondering where I'm at and plus I'm not yet prepared for it, I have plans B's Central, Eastern and Seattle Pacific. I was focusing on Central but not prepared for that either. Didn't think about Eastern because I'm only prepared to be local. I picked Seattle Pacific because I'm less familiar with it and I can see that University of Washington and Seattle University represent Seattle more. I didn't want to have to attack my own city. I went to the SPU campus to get info and find a good area to attack. A couple Mondays ago I was trying to give myself a tour and asking where certain buildings were, acting like a transfer student. I asked this nice black girl where the history building was. For about ten minute's [sic] she showed me around some of the places she knew, I forgot how to say her name. Minutes later, I met a cute white girl named Kylene. She offered to show me around for about fifteen or twenty minutes. These girls were very nice and they treated me well. Because they showed me around the campus without me asking them to, I will single them out of the shooting if I see them.

Ybarra's journal entries became angrier and more hostile as it got closer to the day of the shooting. Ybarra explained that he still loved his family and friends but, "Everybody else in the world, I just want to blow their faces out with a 12 gauge shot gun blast!" Ybarra wrote the last journal entry the morning of the shooting, while parked in his truck outside SPU.

> This is it! I can't believe I'm finally doing this! So exciting I'm jumpy. Since Virginia Tech and Columbine, I've been thinking about these a lot. I use to feel bad for the ones who were killed, but now Eric Harris and Seung Hui Cho became my Idols. And they guided me til today. No matter how cute the girl is and no matter how cool the guy is, I just want people to die! And I'm gonna die with them. I'm not asking for forgiveness because there won't be any. But it is what it is. I'm doing

some people a favor by sending them to heaven. But those who are sinners like me, I'll see you in hell.

Police Interview

Detectives James Cooper and Dana Duffy interviewed Ybarra at the police station following his arrest. During the interview, Ybarra explained his plan, motive, procurement of a weapon, stealth, and method of choosing his victims.

Ybarra explained that three years prior, when he was 23, he began having "bad feelings." Ybarra was diagnosed with obsessive compulsive disorder (OCD) when he was 13 but did not begin having "bad feelings" until his bedroom furniture was replaced by his parents. Ybarra explained that he told his parents to wait to replace his bedroom furniture, but they didn't listen and afterwards he "started losing it." After Ybarra's parents took his furniture away, he "felt nothing but hate. Hundred percent hatred towards the world. Towards everyone. I threatened to massacre the local bar once cause I just wanted everything and everyone to die. And then Columbine came into mind. I don't know how, but it just hit me." Ybarra explained that he felt disrespected, that God had betrayed him when he asked for help, and was overcome with hatred toward the world.

Ybarra planned to attack SPU students using a double-barrel shotgun. Ybarra bought the shotgun when he was 19 years old, but Ybarra's parents put a trigger lock on the shotgun because Ybarra had "rant[ed] about killing people." Ybarra hid bolt cutters in his room so that he could break the trigger lock on his shotgun. Ybarra saved up money for "the right weapons, the right equipment" and was "trying to be well-organized." Ybarra bought three boxes of ammunition over two shopping trips, which

totaled 75 rounds. With that amount of ammunition, Ybarra thought he "was gonna kill and injure more people." Ybarra specifically chose bird shot because "at close range, [bird shot] would disintegrate a human face." Ybarra chose a shotgun, rather than a pistol because Ybarra can hit a moving target more accurately with a shotgun than a pistol.

Ybarra used a "hunter and fisherman's technique," scouting the SPU campus two weeks before the shooting. While on campus, Ybarra pretended to be a transfer student and two students gave Ybarra a tour of the first floor of OMH. Ybarra also talked to an academic advisor and pretended he was transferring from Edmonds Community College. When discussing these encounters during the police interview, Ybarra explained how he "manipulated" the students and academic advisor to get the information he needed. Since the two students treated Ybarra nicely, Ybarra made the conscious decision to show them "remorse" if he saw them during the shooting and spare their lives.

In an effort to plan the shooting when many students were on campus, Ybarra asked the academic advisor when finals began. Ybarra did not want to plan the shooting when classes were not in session and feared if he did not complete the plan soon, he would have to wait until fall semester. While Ybarra was scouting, he was also "mak[ing] sure people were [on campus]."

Ybarra's Trial Testimony

Ybarra testified at trial about hateful feelings, how he formulated his plan from the Columbine and Virginia Tech shootings, and his thought process on the day of the shooting. Ybarra explained the hateful feelings were implanted by Satan and Lucifer,

that God had banished Ybarra to hell, and before Ybarra died, Ybarra had to carry out "God's Plan" and Satan's destruction so that people would focus on "keep[ing] this country a better place." Ybarra explained that he had to keep "God's Plan" a secret, which was why he did not explain the plan in his journal, during the police interview, to his therapists, or the defense's and State's experts. Portions of Ybarra's testimony contradicted itself and Ybarra explained that everything he said prior to his testimony about feeling hatred and admiring the Columbine and Virginia Tech shootings was a "cover-up" and, instead, Ybarra was carrying out "God's Plan."

C.

Dr. Craig Beaver, the defense's expert, and Dr. Kenneth Muscatel, the State's expert, evaluated Ybarra while he was in jail after the shooting and both testified about whether Ybarra was legally insane. Dr. Beaver opined that Ybarra's severe mental disease or defect, "impacted his ability to understand the wrongfulness of his actions." Dr. Beaver explained that Ybarra knew that the shootings were morally wrong, but because he was receiving a direct command from God, he was unable to recognize the moral wrongness of his actions. Dr. Muscatel countered that Ybarra understood that shootings were both legally and morally wrong, but "felt influenced by other forces" and Dr. Muscatel "couldn't conclude that he was legally insane."

D.

The court instructed the jury on manslaughter but denied Ybarra's request to instruct the jury on second degree murder and attempted second degree murder. The manslaughter instruction was consistent with Ybarra's theory that he was firing "warning shots" and wanted to take hostages, rather than intending to kill. The court denied

Ybarra's request for second degree murder instructions because there was no evidence presented that Ybarra intended to kill without premeditation. The jury convicted Ybarra as charged, including all enhancements and aggravators. The court sentenced Ybarra to a standard range sentence, totaling 1,343 months in prison. Ybarra appealed.

At the restitution hearing, the court ordered Ybarra to pay $10,504 to the Crime Victims' Compensation Fund (Victims' Fund) and $2,615.90 to Lee's family for funeral expenses. The court ordered Ybarra to pay Hannah Judd's medical expenses totaling $86.04 from October 21, 2014. Judd assisted Williams with her gunshot wound until paramedics arrived.

Ybarra appeals the judgment and sentence and restitution order.

II.

Ybarra first contends that the trial court improperly commented on the evidence in violation of article IV, section 16 of the Washington Constitution. We disagree.

The standard of review for a claim of judicial comment on the evidence is whether the error was harmless beyond a reasonable doubt. State v. Levy, 156 Wn.2d 709, 731, 132 P.3d 1076 (2006). Judicial comments on the evidence are prohibited under article IV, section 16 of the Washington Constitution, which provides, "[j]udges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." A comment on the evidence is an error of constitutional magnitude, thus a defendant's failure to object or move for mistrial does not foreclose a defendant from raising the issue for the first time on appeal. State v. Becker, 132 Wn.2d 54, 64, 935 P.2d 1321 (1997).

The purpose of article IV, section 16 is to prevent the court's opinion of the evidence from improperly influencing the jury and its deliberation. State v. Lampshire, 74 Wn.2d 888, 892, 447 P.2d 727 (1968). "To constitute a comment on the evidence, it must appear that the trial court's attitude toward the merits of the cause is reasonably inferable from the nature or manners of the court's statements." State v. Miller, 179 Wn. App. 91, 107, 316 P.3d 1143 (2014). If the court's evaluation of a disputed issue is inferable from the judge's statement or the judge communicates their feelings about the veracity of testimony, then the judge improperly commented on the evidence. State v. Lane, 125 Wn.2d 825, 838, 889 P.2d 929 (1995).

If the trial court commented on the evidence, those comments are presumed prejudicial. Levy, 156 Wn.2d at 721. The State bears the burden of showing the defendant was not prejudiced, unless the record affirmatively shows that no prejudice could have resulted. State v. Hartzell, 156 Wn. App. 918, 937, 237 P.3d 928 (2010). The test to determine whether the comments resulted in actual prejudice to the defendant is whether there is "overwhelming untainted evidence" to support the conviction. State v. Sivins, 138 Wn. App. 52, 61, 155 P.3d 982 (2007).

Ybarra contends he was denied a fair trial when the court made three separate comments on the evidence. The first alleged improper comment was on the 10th day of trial. The court updated the jurors on the anticipated schedule for the rest of the week and noted that Dr. Beaver would be testifying the following day. Ybarra objects to the court's statement: "we will go until the [sic] least 4:30 tomorrow afternoon with Dr. Beaver, who is an important witness for the defense. And then we will be starting on

Thursday morning at 8:30 in the morning, so I want you here at 8:20 to continue with Dr. Beaver."

The second alleged improper comment was at the end of Dr. Beaver's testimony. The court explained the upcoming schedule and why he was releasing jurors early that day:

> Thank you, Dr. Beaver, you are all done. You are excused, and so are you. We planned a long period of time for this witness, obviously, an important witness, so in case it took all day, and we have no other witnesses planned for today. So the next time we are going to meet will be next Monday, at nine o'clock. There is still much more to hear, the defense has more witnesses to call, the State is planning on putting on rebuttal testimony, so please continue to keep an open mind as you proceed through the case.

The third alleged improper comment occurred during Dr. Muscatel's testimony. After the State asked Dr. Muscatel to refer to a "marked up" copy of his report, the court interjected and explained to the jury that the report would not be available during deliberations:

> If you wish to look at it. Any exhibit used by the witness is viewable by counsel in any case, so we are taking a moment for that and I probably should have said this earlier, but many exhibits that have been marked in this case, as you know, witnesses relied upon them to either remember to refresh their memory, or perhaps they have no memory, and we have provided them those exhibits. The testimony of the witnesses is the evidence, for example, Dr. Muscatel will be talking from his report, and of course, Dr. Beaver did the same. Those reports were not admitted into evidence, so their testimony is the evidence that you will use in making your decisions about this case.

Ybarra avers that together the court's comments implied that the court believed Dr. Beaver's and Dr. Muscatel's testimony was "some of the most significant evidence at trial" and that the State had met its burden of proving the underlying crimes, and "the

only issue for jurors was whether Ybarra should be found [not guilty by reason of insanity]."

Ybarra first contends the court's comments are analogous to the trial court's comments in Lampshire. In Lampshire, the prosecutor objected to the materiality of testimony offered by the defendant. The trial court sustained the objection, commenting that "Counsel's objection is well taken. . . . I don't see the materiality, counsel." Lampshire, 74 Wn.2d at 891. While the Supreme Court recognized that the court's comment was inadvertently made while ruling on a motion, it concluded that "the remark implicitly conveyed to the jury his personal opinion concerning the worth of the defendant's testimony." Lampshire, 74 Wn.2d at 892.

Unlike Lampshire, the trial court's comments during Ybarra's trial were about scheduling witnesses, not the value of their testimony. Both parties anticipated long, multi-day testimony from Dr. Beaver and scheduled two full days. On the second day of Dr. Beaver's testimony, no other witnesses had been scheduled and the jury was released early. The court's comment related to why the jury was released early, but reminded the jury that there was still more testimony to hear. The court's opinion of the credibility or worth of the testimony is not apparent from the comment. Instead, it is readily apparent from the comments that the judge was informing the jury about scheduling in a multi-week trial.

Ybarra points next to State v. James, 63 Wn.2d 71, 385 P.2d 558 (1963). In James, the State moved to discharge one of the defendants so that he could testify for the State. The trial court granted the motion and explained to the jury that "the prosecuting attorney made a motion to discharged defendant Topper so that he may

testify as a witness for the state, and the Court has granted that motion provided that he testify fully as to all material matters within his knowledge." Id. at 74. The Supreme Court concluded that the trial court's comment deprived James of a fair trial because after Topper's testimony and subsequent discharge as a defendant, the "the jury could draw only one conclusion: the court was satisfied that Topper had testified 'fully as to all material matters within his knowledge.'" Id. at 76. But here, unlike James, neither doctor was allowed to testify conditionally based on the veracity of testimony.

Ybarra next analogizes to State v. Bogner, 62 Wn.2d 247, 382 P.2d 254 (1963). In Bogner, defense counsel argued that there were two issues before the jury: whether a robbery occurred, and then who did it. The following colloquy took place between the trial court and defense counsel [Haley]:

> The Court: Are you denying that there was a robbery at the housing project at that time on that date? Mr. Haley: I don't know, your Honor. I think that is what we are here to determine. The Court: We are here to determine, as I understand it, who did it, if anyone. Mr. Haley: Of course, we have a two-fold purpose. We are trying to determine whether or not there was a robbery and the second point is, who committed the robbery. The Court: Don't you think we are getting a little ridiculous, or aren't we?

Bogner, 62 Wn.2d at 249. The Supreme Court concluded the trial court's comment violated the defendant's constitutional right because:

> the remarks of the trial judge could only have had the effect of indicating to the jury that the judge believed that at this point in the trial it could not be denied that a robbery had taken place, and that this essential element of the prosecution's case had been so well established that to suggest otherwise was 'getting a little ridiculous.'

Bogner, 62 Wn.2d at 250.

Again, unlike Bogner, the trial court here did not comment about whether the State proved an essential element of its case. Instead, the court's comment related to

managing the proceedings and informing the jury of scheduling in a trial spanning multiple weeks.

Finally, Ybarra relies on State v. Vaughn, 167 Wn. 420, 423-24, 9 P.2d 355 (1932). In Vaughn, the court commented on the credibility of the prosecutor, who was called as a witness to testify about a secret agreement between Vaughn's codefendant and the prosecutor. The judge's comment had the effect of vouching for the veracity and rectitude of the prosecutor. Vaughn, 167 Wn. at 424. Again, here, the trial court did not make comments alluding to the veracity and rectitude of the testifying physicians. Thus, Vaughn is not analogous.

Ybarra has not provided a case where a trial court's comment about scheduling or characterization that a witness is "important" demonstrates the court's attitude towards the witness or the witness's testimony. The length of this trial informs the context of these comments. For instance, Dr. Beaver and Dr. Muscatel testified in early November, in a trial that began in early October and ended in early November, with over 40 witnesses testifying. In a long trial, the trial court must keep jurors informed of scheduling and periodically remind jurors to remain open-minded throughout testimony. At one point, the court explained that no other witnesses were scheduled because all parties had anticipated that Dr. Beaver's testimony would take all day and the jurors were being released early because of that scheduling decision. Finally, the court's explanation to the jury that the doctors' reports would not be in evidence, and that during deliberation, the jurors would rely on the doctors' testimony, does not show the judge's personal opinion about the doctors' testimony. None of these comments

suggest that the court believed the State had met its burden of proof or that the court believed certain testimony to the detriment of other testimony.

Even analyzing these comments together, the trial court's attitude about the veracity of witnesses' testimony or a disputed issue of fact is not apparent. We conclude that the trial court did not improperly comment on the evidence.

III.

Ybarra next contends that the trial court abused its discretion by denying his request for jury instructions on second degree murder and attempted second degree murder. We disagree.

The standard of review for instructional errors depends on whether the court's decision to deny the instruction was based on a factual determination or a legal conclusion. State v. Condon, 182 Wn.2d 307, 315-16, 343 P.3d 357 (2015). Decisions based on a factual determination are reviewed for abuse of discretion, while legal determinations are reviewed de novo. Condon, 182 Wn.2d at 315-16. We review the trial court's decision to deny Ybarra's request for instructions on second degree murder and attempted murder for abuse of discretion because the court denied Ybarra's request based on a lack of evidence proving simple intent versus premeditation. A trial court abuses its discretion when the "decision is manifestly unreasonable, or is exercised on untenable grounds, or for untenable reasons." State v. Blackwell, 120 Wn.2d 822, 830, 845 P.2d 1017 (1993).

In State v. Workman, 90 Wn.2d 443, 447-48, 584 P.2d 382 (1978), our Supreme Court set out a two-pronged test to determine whether a party is entitled to an instruction on a lesser included offense. Under the first, or legal prong, the court asks

-14-

"whether the lesser included offense consists solely of elements that are necessary to conviction of the greater, charged offense." Condon, 182 Wn.2d at 316. Under the second, or factual prong, "the court asks whether the evidence presented in the case supports an interference that only the lesser offense was committed, to the exclusion of the greater, charged offense." Id. at 316. When the answer to both prongs is "yes," the requesting party is entitled to the lesser included offense instruction. Id. at 316.

In Condon, the Supreme Court concluded that second degree murder is a lesser included offense to aggravated first degree murder under the Workman legal prong "because it consists solely of elements that are necessary for conviction of that greater offense." Condon, 182 Wn.2d at 319.[1] Since second degree murder is a lesser included offense of first degree murder, only the factual prong is at issue in this appeal.

The factual prong "incorporates the rule that each side may have instructions embodying its theory of the case if there is evidence to support that theory." State v Berlin, 133 Wn.2d 541, 546, 947 P.2d 700 (1997). The standard is that "some evidence must be presented which affirmatively establishes the defendant's theory on the lesser included offense before an instruction will be given." Id. at 546 (citing State v. Fowler, 114 Wn.2d 59, 67, 785 P.2d 808 (1990)). "When evaluating whether the evidence supports an inference that the lesser crime was committed, courts view the evidence in the light most favorable to the party who requested the instruction." State v. Henderson, 182 Wn.2d 734, 344 P.3d 1207 (2015).

---

[1] *Compare* RCW 9A.32.050 (a person commits second degree murder when, with intent to cause the death of another person but without premeditation, he or she causes the death of such person or of a third person), *with* RCW 9A.32.030(1)(a) (a person commits first degree murder, when with a premeditated intent to cause the death of another person, he or she causes the death of such person or of a third person), *and* RCW 10.95.020 (listing aggravating circumstances).

-15-

Ybarra requested jury instructions on the lesser included offense of murder and attempted murder in the second degree. "A person is guilty of murder in the second degree when: (a) [w]ith intent to cause the death of another person but without premeditation, he or she causes the death of such person or of a third person." RCW 9A.32.050(1)(a). "A person is guilty of an attempt to commit a crime if, with intent to commit a specific crime, he or she does any act which is a substantial step toward the commission of that crime." RCW 9A.28.020.

Second degree murder is first degree murder without premeditation. RCW 9A.32.030(1)(a).[2] Premeditation is "the deliberate formation of and reflection upon the intent to take a human life" and involves "the mental process of thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short." State v. Gentry, 125 Wn.2d 570, 597-98, 888 P.2d 1105 (1995). Premeditation "must involve more than a moment in point of time." RCW 9A.32.020(1). The following factors are relevant to establish premeditation: motive, procurement of a weapon, stealth, and method of killing. State v. Pirtle, 127 Wn.2d 628, 644, 904 P.2d 245 (1995).

Ybarra contends that the evidence supported his theory that he lacked premeditation because his premediated plan was to enter the OMH classroom through the back door and kill as many people as possible. Ybarra argues that the plan was not carried out because the back door was locked and he instead entered through the main entrance and shot at Lee, Fowler, Curturlio-Hackney, and Williams in the OMH lobby on his way to the OMH classroom. He contends his decisions to shoot were

---

[2] "A person is guilty of murder in the first degree when: (a) with a premeditated intent to cause the death of another person, he or she causes the death of such person or a third person."

spontaneous—based on the victims' reactions to seeing him with a gun on campus and "failing to respect that he was armed with a gun." The State responds that "there was no evidence that Ybarra intended, but did not premeditate the crimes."

Intent to kill without premeditation can be shown with evidence that the defendant killed in an impulsive or reactionary manner to the victim's resistance. In Condon, the Court held that the trial court erred when it did not instruct the jury on second degree murder in addition to premeditated first degree murder. Condon, 182 Wn.2d at 311. The defendant, Joel Condon, and Jesus Lozano entered the home of Carmelo Ramirez and Enedina Gregorio under the mistaken belief that it was the home of a drug dealer whom they planned to rob. Condon, 182 Wn.2d at 311. During the robbery, Ramirez put Lozano in a choke hold and when Lozano was losing consciousness from lack of oxygen, Condon shot Ramirez. Condon, 182 Wn.2d at 312. Ramirez died before reaching the hospital. Condon, 182 Wn.2d at 312.

The trial court refused to instruct the jury on second degree murder because Condon shot Ramirez twice and was reflective and cool enough "to be able to say at some point that Lozano was lucky he didn't get shot and that ultimately he probably should have shot him too." Condon, 182 Wn.2d at 320. This reasoning, however, was not sound because the evidence showed Condon's later reflection on the shooting, not his premeditated intent prior to the shooting. Condon, 182 Wn.2d at 320. The Supreme Court held that, while there was evidence from which a rational juror could find that the shooting was premeditated, there was also evidence supporting a lack of premeditation through "an inference that the shooting was a sudden reaction, based in fear rather than

-17-

'weighing or reasoning'" and was impulsive and reactionary. Condon, 182 Wn.2d at 320.

Condon is distinguishable from the facts here. Condon entered the home with the intent to commit robbery, but murdered the victim when he fought back. Condon, 182 Wn.2d at 311-12. There was evidence of both first and second degree murder, depending on whether the jury believed Condon had premeditated before pulling the trigger, or whether the intent to murder was a direct and impulsive reaction to the victim fighting back and made without premeditation.

In contrast, Ybarra went to SPU with the premeditated intent to kill students. There is ample evidence that Ybarra planned, over a period of several weeks, to kill students at SPU. Ybarra scouted the SPU campus, planning where the shooting would occur. Ybarra purchased three boxes of ammunition and brought two weapons and the ammunition to campus for the purpose of killing students. Ybarra explained that if he saw the students who had given him a tour of the SPU campus, Ybarra intended to show them mercy. Ybarra went to campus that day with premeditated intent to kill students.

Ybarra tries to cabin his premeditated intent to kill students specifically in the OMH classroom, and argues that there was evidence that Ybarra intended to kill, but lacked premeditation for any shots fired outside OMH or in the lobby of OMH. Ybarra indicated that he "wasn't trying to kill anyone outside, the plan was just to wound them." This supports the manslaughter instructions, but not the second degree murder instructions. There is no evidence to support Ybarra's theory that he intended to kill, but without premeditation, thus the trial court did not abuse its discretion.

Furthermore, Ybarra's argument that his premeditated intent to kill was confined to killing students in a classroom ignores the plain language of RCW 9A.32.030 which states:

> (1) A person is guilty of murder in the first degree when:
> (a) With a premeditated intent to cause the death of another person, he or she causes the death of such person or of a <u>third person</u>.[3]

Thus, even if Ybarra intended only to kill students in the OMH classroom, in carrying out this premeditated intent, there is no dispute that he caused the death of a third person on his way to the classroom. His actions still meet the definition of first degree murder.

The evidence presented does not support an inference that Ybarra only intended to commit the lesser offense of second degree murder to the exclusion of first degree murder. <u>Condon</u>, 182 Wn.2d at 316. Because Ybarra does not meet the factual prong of the <u>Workman</u> test, the trial court did not abuse its discretion in denying Ybarra's request for a lesser included instruction of second degree murder.

## IV.

Finally, Ybarra contends that his counsel was ineffective for failing to object to the $86.04 restitution charge for Judd's medical expenses. We disagree.

The Sixth Amendment affords a defendant the right to be represented by counsel in all criminal prosecutions. U.S. CONST. amend. VI. A defendant's counsel is ineffective where the attorney's performance was deficient and the deficiency prejudiced the defendant. <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. E. 2d 674 (1984). The defendant must show that both (1) his attorney's performance was

---

[3] (Emphasis added.)

deficient and not a matter of trial strategies or tactics, and (2) that he was prejudiced. State v. Mannering, 150 Wn.2d 277, 285-86, 75 P.3d 961 (2003). "There is a presumption of effective representation, and the defendant must show in the record the absence of a legitimate strategic or tactical reason supporting the challenged conduct by counsel." Mannering, 150 Wn.2d at 286.

A defendant is prejudiced when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

Ybarra raised the issue of whether Judd was a victim in his motion to oppose restitution. At the restitution hearing, the trial court noted that "[t]here was a specific exception taken to restitution requests submitted by Hannah Judd. As far as other specifics, I think it was about the scope of the funeral home." Counsel for defense agreed with the court's characterization of the defense's motion and stated that prior counsel, "did file a brief on some of the issues, and I'm just resting on the brief. No further arguments."

Argument moved to specifics and defense counsel indicated "I'm prepared to concede causal connection to most of the costs or restitution requests that the State has submitted in this matter, and I can narrow them down to three specific items that— or actually it's two." Discussion moved on to costs related to Lee's funeral.

The court sentenced Ybarra to a standard range sentence, totaling 1,343 months in prison. The court ordered Ybarra to pay $10,504 to the Victims' Fund, $2,615.90 to Lee's family for funeral expenses, and $86.04 for Judd's medical expense.

It is within a defense attorney's strategic choice to concede the causal connection for an $86.04 restitution charge when the defendant was facing 111 years in prison and had been ordered to pay a total of $13,119.90 in restitution. We conclude that Ybarra's counsel was not ineffective for conceding the $86.04 restitution charge for Judd's medical expenses.

Affirmed.

_Mann, ACJ_

WE CONCUR:

_Smith, J._                    _Andrus, J._